DEC 16 2021 PM2:45
FILED-USDC-CT-NEW_HAVEN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MONIQUE N. BRADY | : |
| | : |
| Petitioner, | : |
| | : |
| v. | : Civ. No.: 3:21 cv 1671 (SVN) |
| | : |
| W. HESS, Acting Warden of Federal | : |
| Correctional Institution at Danbury, and | : |
| MICHAEL CARVAJAL, Director of | : |
| The Federal Bureau of Prisons, in their | : |
| official capacities | : |
| | : |
| Respondents | : |

## AFFIDAVIT OF PETITIONER, MONIQUE N. BRADY, IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

My name is Monique N. Brady, BOP Register Number 12117-070, and I am the Petitioner in the above-referenced matter. I have personal knowledge of the within matter and therefore under oath, I depose as follows:

1. I am a 46 year-old woman who, at all times relevant herein, has been in the custody of the BOP at FCI Danbury and am currently housed in FCI Danbury's women's minimum-security camp (the "Camp"). I currently suffer from four (4) medical vulnerabilities, recognized by the Center for Disease Control ("CDC"). Due to my having been incarcerated at the camp since the onset of Covid-19 and having been part of a class action lawsuit (*Whitted et al. v. Easter; 20-cv-00569*), which was brought by similarly-situated inmates who were medically vulnerable to the effects of contracting COVID-19, I have learned that having a weakened immune system can make you more likely to get severely ill from COVID-19. The CDC reports that many conditions and treatments can cause a person to be immunocompromised or have a weakened immune system. Prolonged use of corticosteroids or other immune

1

weakening medicines can lead to secondary or acquired immunodeficiency. People who have a condition or are taking medications that weaken their immune system may not be protected even if they are fully vaccinated. They should continue to take all precautions recommended for unvaccinated people, including wearing a well-fitted mask, until advised otherwise by their healthcare provider.

2. I suffer from (a) Bursitis in my elbow; (b) arthritis in the foot and (c) Carpal Tunnel Syndrome, for which I continue to take cortisone, a well-known immune-suppressant drug. I also take Trazadone and Sertraline, which are equally well known immune-suppressant drugs, in that their very purpose is to alter or lessen immune responses). According to the CDC, having a weakened immune system can make you more likely to get severely ill from COVID-19. Furthermore, as stated on the CDC website, people with moderately to severely compromised immune systems should receive an <u>additional</u> dose of mRNA COVID-19 vaccine at least 28 days after the second dose. Not only am I immuno-compromised from the cortisone injections that I receive, but also, BOP's own medical doctor (as more fully set in paragraph 5) has advised me not to take the second dose of vaccine after I had an extremely negative reaction to the first dose. Therefore, I am housed in a congregate setting at the Camp and cannot take the second Covid-19 vaccine, nor can I take the additional booster to the vaccine, which is now available. Another factor which significantly endangers my health if I were to contract Covid-19 is the presence of the Delta variant of the virus. My inability to take the second dose, the current booster and all future boosters places me in significant danger or risk of severe illness from COVID.

3. Being a current or former cigarette smoker can make you more likely to get severely ill from COVID-19, as provided on the CDC's website. I have a 25-year history of smoking cigarettes, a fact which was evident in medical, dental and life insurance records, previously provided to class counsel in the inmates' class action petition for writ of habeas corpus. My history of smoking was a Tier I risk factor under the CDC's previous classification system

and now appears in the top of four tiers in the CDC's "Table of COVID-19." Placement of a condition in the top tier of the Table of Evidence means that the most rigorous scientific studies support an association with severe illness from COVID. My history of heavy smoking is reflected in my BOP medical records (1 pk/day x 25 years), and my tobacco use is corroborated by my dental examination by the BOP, along with pre-incarceration medical records provided in the *Whitted* class action suit.

4. My weight has increased since being incarcerated and my BMI now places me in the category of "obese" rather than overweight. Obesity, like history of smoking, was a Tier I risk factor under the CDC's previous classification system and is now in the top of the four tiers in the Table of Evidence. "Evidence," which lists conditions that "have been shown to be associated with severe illness from Overweight (defined as a body mass index (BMI) > 25 kg/m$^2$ but < 30 kg/m$^2$), **obesity (BMI ≥30 kg/m$^2$ but < 40 kg/m$^2$)**, or severe obesity (BMI of ≥40 kg/m$^2$), can make you more likely to get severely ill from COVID-19. My medical records from BOP doctors indicate that my BMI of greater than 30 BMI places me into the obese category.

5. Although I received one dose of the COVID-19 vaccine, I have been advised by the FCI Danbury facility's clinical director, Dr. Greene, not to receive a second dose. I remain at risk for COVID at FCI Danbury given the risks posed by the Delta variant and the uncertainty about how long any protection from the one dose will last. My decision to decline the second dose of the vaccine was based solely on medical advice of FCI Danbury's clinical director that I do not take the second dose of the vaccine. I believe in the science of the vaccine and its health benefits but as Dr. Greene advised, like my allergy to erythromycin, my previous experience following the first dose could indeed be a harbinger of a more serious (re: systematic) somatic response to the second dose. I am following the advice of my doctor but doing so places me in continued danger to all of the potential severe complications of contracting COVID-19.

6. While I was a member of the class action in *Whitted v. Easter* (above), the Defendant, Federal Bureau of Prison's (the "BOP") reviews of me for home confinement have been repeatedly noncompliant. In my first review, the Home Confinement Committee (the "HCC") failed to consider my history of smoking and denied me based on percentage/amount of time served, contrary to both the Settlement Agreement and Court Order. In my second review, the HCC used an erroneous "totality of the circumstances" standard and based its denial on unsubstantiated concerns for my own safety if released. With my third and latest review, rather than focusing on whether I presented an immediate danger to the community, the HCC repeated its reliance on purported concerns for <u>my</u> own safety—contrary to the *Whitted* Settlement Agreement and Judge Shea's explicit guidance—and focused its reasons for denial on victim impact and opposition to release. Class counsel filed motions to enforce the Settlement Agreement, the last of which was eventually referred to Federal Magistrate Farrish, who was unaware of my inability to take the second shot or additional boosters. Magistrate Farrish's denial of my re-review did not paint a full picture of my medical vulnerabilities and his recommendation was to deny me further re-reviews with HCC. Class counsel filed an objection, but to date, Judge Shea has neither scheduled a hearing on class counsel's motion nor scheduled a requested status conference. The terms of the Settlement Agreement expired on October 31, 2021, leaving me no additional remedies other than filing the instant Petition for Writ of Mandamus.

7. My offense, while serious, was a financial crime. The offense did not involve violence or threats of violence, and I have no history of violence. In assessing my public safety risk level, the BOP placed me in the minimum security Camp at FCI Danbury (a facility with no perimeter fencing). The BOP assessed my recidivism risk as Minimum. I have remained <u>discipline-free</u> while in BOP custody and have contributed to the wellbeing of others at the Camp through teaching, tutoring and volunteering in numerous ways. As part of the *Whitted* settlement Agreement, the HCC has granted home confinement, during the course of

4

litigation, to more than sixty individuals convicted of fraud, bribery, or tax related offenses (or other non-violent, non-sexual, and non-drug related offenses). Most strikingly, as set forth in class counsel pleadings, a review of home confinement denial decisions has revealed that I am one of only three individuals denied home confinement under the Settlement Agreement who are first time offenders with Minimum PATTERN scores serving sentences for non-violent and non-sexual offenses. Of those approximately sixty fraud/bribery cases (or other non-violent/non-sexual/non-drug cases) where the HCC has granted home confinement, nineteen individuals had higher PATTERN scores than I do. (16 individuals had Low scores; three had Medium). In at least 5 of the cases, the loss amounts to victims were higher than in my case. The fact that I committed a serious fraud offense by no means predicts that I am an immediate danger to the community. In addition, many of the individuals granted home confinement have had lower tier CDC risk factors than I. In particular, of these approximately sixty cases, at least thirteen involved individuals with only Tier II conditions under the CDC's previous categorizations (conditions that now fall in the second or fourth tier on the CDC's Evidence Table). The fact that I had one dose of the vaccine also does not explain my disparate treatment. In at least six of these sixty cases, BOP has granted home confinement to individuals who have had one shot and were expected to receive another shot in the near future. Overall, home confinement has been granted in two hundred cases since the litigation began. Given the history of grants of home confinement in similar cases, as well as the HCC's exceedingly rare rate of denial in similar cases, equitable considerations strongly favor my release to home confinement. Given, not only my medical vulnerabilities, but also my disparate treatment in the *Whitted* litigation.

8. Dr. Greene, at BOP, has advised me that I unable to be fully protected from the COVID-19 virus. This fact materially impacts the weighing of inmate safety and public safety and thus entitles me, given my inability to be safely housed at the camp, to be released to home. Dr. Greene advised me not to take the second dose of the vaccine given the allergic reaction I had

5

to the first dose. Dr. Greene is the clinical director of FCI Danbury and charged with protecting the health of people incarcerated at the facility. He has been my treating doctor since I arrived at FCI Danbury. Based on his in-person assessment of his patient, Dr. Greene advised me not to take the second dose. An exhibit in the *Whitted* litigation stated that "Inmate was advised not to take the 2nd dose of the vaccine because her previous somatic experience following the 1st dose could in deed[sic] be a harbinger of a more serious (re: systemic) somatic response with the 2nd dose."). As recent as July 16, 2021, the CDC, via its website, updated its warning to people in congregated populations, stating: "People who are immunocompromised should be counseled about the potential for reduced immune responses to COVID-19 vaccines and to follow current prevention measures (including wearing a mask, staying 6 feet apart from others they don't live with, and avoiding crowds and poorly ventilated indoor spaces) to protect themselves against COVID-19 until advised otherwise by their healthcare provider." The CDC explains further that "data suggest immune response to COVID-19 vaccination might be reduced in some immunocompromised people including, but not limited to, people receiving chemotherapy for cancer, people with hematologic cancers such as chronic lymphocytic leukemia, people receiving stem cells or organ transplants, people receiving hemodialysis, and people using certain medications that might blunt the immune response to vaccination (e.g., mycophenolate, rituximab, azathioprine, anti-CD20 monoclonal antibodies, Bruton tyrosine kinase inhibitors)." Moreover, per the CDC, "[c]lose contacts of immunocompromised people should also be encouraged to be vaccinated against COVID-19 to help protect these people." As a person who cannot be fully vaccinated and one who is an immunocompromised individual I live in a risk-filled population. If I am offered a booster shot, I will need to decline for the same reasons for which Dr. Greene told me to refrain from taking the second shot.

9. Neither I nor class counsel in the *Whitted* litigation are aware of the current percentage of incarcerated people at FCI Danbury who are fully inoculated against COVID. BOP's website

6

shows the number of inoculations of incarcerated people that have been performed at FCI Danbury rather than the number of individuals currently incarcerated at the facility who are inoculated. These numbers are not equivalent because of the number of people being transferred in and out of the facility. BOP has also declined to provide information about the percentage of staff who have been inoculated. BOP's website reports that 180 staff members at FCI Danbury have been fully inoculated but does not indicate the total number of staff members at the facility. Also not provided is information about vaccination rates among contractors who conduct work at the facility. This continuing exposure to unvaccinated people continues to put at risk of contracting and experiencing the heightened negative reactions to contracting COVID-19.

10. The Camp population is currently at approximately 64 women as compared to the population of 153 at the Camp when the *Whitted* litigation was filed. However, FCI Danbury closed Dorms A and D in the Camp, so the women are crowded into Dorms B and C. Double bunking in those dorms has begun, including my own "room," and staff have informed women in the Camp to expect more double bunking with the arrival of many more women at the Camp. Living in even tighter quarters places me in further risk of the severely ill effects of COVID-19 if contracted.

11. I remain at risk for contracting COVID, particularly given the inability to socially distance, inadequate COVID-19 detection practices at the facility, and the emergence of the highly contagious Delta variant in the region. FCI Danbury is fully "reopened" with incarcerated people and staff circulating around each of the facilities, and some moving between facilities. Practices for detecting COVID at FCI Danbury also appear inadequate. It does not seem that facility-wide COVID testing has been performed since May 2020, or that any form of surveillance testing is being utilized at the facility. It is unclear if any unit-wide testing was performed between the beginning of January 2021 and present. The announcement notes that individuals can take their own temperature with thermometers left at the officer stations with

self-reporting of symptoms associated with COVID brings me little comfort that BOP is committed to protecting me and my fellow inmates. At of the writing of this affidavit, all pre-COVID visitation procedures have resumed, permitting visitors of camp inmates to enter the visitation rooms, up to 8 hours per visit. If the threat level, in the State of Connecticut increases, the extended visits with public will be suspended, but the threat of contracting COVID-19 only increases by the influx of exposure to staff and vendors, entering and exiting the Camp on a daily basis.

12. FCI Danbury simply cannot ensure my safety from the severely dangerous and potentially life-threatening effects of my contracting COVID-19. FCI Danbury continues to thwart its responsibilities in protecting inmates' health, safety and welfare. No longer can the congregate setting of the camp in which I reside become more congregated, denser, without dangerously imperiling my daily fears and more importantly my health. Scientifically based evidence exists that, with my medical vulnerabilities, I am not safe to be double-bunked with another inmate in a tight living space in a dorm, which at one time was one of four and now houses the same number of inmates (and growing) in two dorms. FCI Danbury's conscious indifference to inmate safety to the perils of COVID-19 and its many variants is a direct and proximate cause to my filing the within Petition for Writ of Mandamus and makes said filing reasonable, necessary and warranted.

_____
MONIQUE N. BRADY

STATE OF CONNECTICUT
COUNTY OF FAIRFIELD

In the Town of Danbury, County of Fairfield, State of Connecticut, on the 10 day of November 2021, before me personally appeared Monique N. Brady, to me known and known by me to be the person who executed the foregoing instrument, and she acknowledged the same to be her free act and deed.

_____
NOTARY PUBLIC
My Commission expires: 3-31-2026

State of CT County of Danbury
The foregoing instrument was acknowledged before me this 10 day of November, 20 21.
by R. Vargas
_____ Notary Public
My Commission Expires 3-31-2026

SNPC. 0183270

ROBINSON VARGAS
Notary Public, Connecticut
My Commission Expires - See License

10